*Linda Mys v. Michigan Department of State Police*
USDC-WD No: 1:10-cv-794
Honorable Robert J. Jonker

# EXHIBIT 1

June 24, 2005
IA Complaint and Investigation

# IA-075-05

**COMPLAINT AGAINST MEMBER**   IA number: IA2005-075   Received: 06/24/2005 17:30

*[Stamp: AUG 2005 Received Michigan State Police Internal Affairs]*

Case number:

Officers involved:

**D/SERGEANT RICHARD C MILLER**

Officer current info:

Badge no: 75  EMPLOYEE NUMBER: 116387
WORK SITE: 65 - NEWAYGO

Snapshot - officer information at time of incident:

Badge/ID no: 75
BUREAU/OFFICE: FIELD SERVICES REGION I
DISTRICT/DIVISION: SIXTH
WORK SITE: 65 - NEWAYGO
Rank/title: D/SERGEANT
Age: 57  Years of employment: 33  Years with unit:
In uniform: YES  Off duty: NO  Off duty employed: NO

Actions taken:

Aug 22, 2005 - NOT SUSTAINED  Days/hrs suspended/assessed:

Officer complainants:

**SERGEANT LINDA ANN MYS**
Badge/ID no: 318  EMPLOYEE NUMBER: 121617
BUREAU/OFFICE: FIELD SERVICES REGION I

Summary:

THE COMPLAINANT ALLEGES D/SERGEANT MILLER TOUCHED HER INAPPROPRIATELY AT WORK AND AWAY FROM WORK. THE ALLEGATIONS INCLUDE D/SERGEANT MILLER LOOKING DOWN HER T-SHIRT AT THE POST, TOUCHING HER ON THE BUTTOCKS, TOUCHING HER BREAST WHILE WORKING, RUBBING HER BACK AND NECK WHILE WORKING AND BEING IN HER PHYSICAL PRESENCE WHEN HE DOES NOT NEED TO BE. SHE FURTHER ALLEGES THAT ON JUNE 17, 2005, D/SERGEANT MILLER WAS OFF DUTY AT HER RESIDENCE AND ENGAGED IN UNWANTED PHYSICAL CONTACT.

Investigative tasks:

| Due dt | Done dt | Type |
|---|---|---|
| 06/24/2005 | 06/24/2005 | SUSPENDED CRIMINAL |
| 06/28/2005 | 06/28/2005 | UNSUSPENDED CRIMINAL |
| 07/13/2005 | 07/13/2005 | RESUSPENDED CRIMINAL |
| 07/20/2005 | 07/20/2005 | UNSUSPENDED CRIMINAL |
| 07/31/2005 | 08/08/2005 | 30 DAY REVIEW |
| 08/15/2005 | 08/15/2005 | 45 DAY REVIEW |

**When/where:**

Date/time occurred:

   County: NEWAYGO

**Linked Word documents:**

   Aug 22, 2005: ORIG AICS REPORT
   Aug 22, 2005: CLOSING LTR COMPLAINANT
   Aug 22, 2005: CLOSING MEMO PRINCIPAL

**Status/assignment information:**

Status: COMPLETED   Priority: MEDIUM

Opened: 06/24/2005   Assigned: 06/24/2005   Due: 09/29/2005   Completed: 08/22/2005

Disposition: NOT SUSTAINED

Unit assigned: INTERNAL AFFAIRS

Investigator assign: F/LIEUTENANT DANIEL PEKRUL

Supervisor assign: LIEUTENANT SCOTT MARIER

Source of information: IN PERSON

**Organizational component(s):**

BUREAU/OFFICE: FIELD SERVICES REGION I
DISTRICT/DIVISION: SIXTH
WORK SITE: 65 - NEWAYGO

**FOR INTERNAL AFFAIRS USE ONLY**

| Region/Bureau Review | Date Reviewed |
|---|---|
| Closing IA Signature  F/Lt Daniel E. Pekrul | Date  8/22/05 |




STATE OF MICHIGAN
DEPARTMENT OF STATE POLICE
EAST LANSING

JENNIFER M. GRANHOLM
GOVERNOR

COL. TADARIAL J. STURDIVANT
DIRECTOR

August 22, 2005

Sgt. Linda A. Mys
Michigan State Police
Newaygo Post
360 Adams
Newaygo, Michigan 49337

Dear Sergeant Mys:

This correspondence is to advise you that the investigation into the complaint you filed against D/Sgt. Richard Miller was thoroughly investigated and is now complete. The investigation has been carefully reviewed by our Sixth District command staff, in conjunction with Internal Affairs, and is being closed as not sustained.

The Department of State Police has a proud history of professionalism and courtesy. When complaints are received that indicate our employees are not meeting the high standards of the agency, we take them seriously and investigate thoroughly.

Thank you for bringing this matter to our attention. If you have any questions regarding this investigation you may contact me at (517) 336-6562.

Sincerely,

SCOTT MARIER, LIEUTENANT
Professional Standards Section
Internal Affairs

UD-040 (10/02)
MEMORANDUM

# STATE OF MICHIGAN
# DEPARTMENT OF STATE POLICE

**DATE:** August 22, 2005

**TO:** D/Sgt. Richard C. Miller
Newaygo Post

**FROM:** Lt. Scott Marier
Executive Division, Internal Affairs

**SUBJECT:** IA-075-05 Closing

Internal investigaton IA-075-05, dated June 24, 2005, has been thoroughly investigated and is now complete. Internal Affairs in conjunction with Sixth District reviewed the facts of the investigation on August 22, 2005, and determined that it should be closed as not sustained.

If you have any questions regarding this matter, you may contact me at (517) 336-6562.


pc: Capt. Gary Gorski
Insp. Dave Bush
F/Lt. Kevin Leavitt

*"A PROUD tradition of SERVICE through EXCELLENCE, INTEGRITY, and COURTESY"*

| Internal Affairs | ORIGINAL DATE Fri, Jun 24, 2005 | | INCIDENT NO. 001-0000075-05 (SM) | |
|---|---|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED 1730 | | FILE CLASS 99009 | |
| | WORK UNIT MSP EXEC DIV IA AICS | | COUNTY Van Buren | |
| COMPLAINANT SERGEANT LINDA MYS | | | TELEPHONE NO. | |
| ADDRESS: STREET AND NO. | | CITY | STATE | ZIP CODE - |
| INCIDENT STATUS Open | | | | |

# OTHER

### SUMMARY:

The complainant, Sgt. Linda Mys, alleges that D/Sgt. Richard Miller has touched her inappropriately on four separate occasions. Both are assigned to the Newaygo Post. The investigation established there has been a significant emotional relationship that has developed between them from July 2003 to June 2005. Sgt. Mys and D/Sgt. Miller have had multiple meetings off duty in which they discussed matters of a personal nature with each other. The complaint resulted from an incident that occurred on June 17, 2005 at Mys' residence, which she described to Dr. Woolford of the Behavioral Science Section a week after the incident. Dr. Woolford subsequently contacted the department for action.

Sgt. Mys stated her relationship with D/Sgt. Miller deepened following the death of Tpr. Kevin Marshall and that she and Miller became confidants. She stated she would discuss her inability to cope with Marshall's death, as well as her use of alcohol. Mys stated Miller would speak to her about his marital problems as well as his past use of alcohol. Mys stated she never advised Miller she did not care for his comments or attention, that she did not advise a command officer there was a problem, and stated she chose to run from the problem rather than address it. Mys described four separate incidents of potential CSC 4th, stating that Miller approached her from behind in the post and touched her breast, pulled her shirt away from her torso in order to view her breasts at the post, touched her buttocks while on the shooting range, and forced her shirt over her breasts while at her residence. Sgt. Mys was very indecisive as to whether she wanted the allegations to be reviewed criminally, changing her mind twice after her initial decision not to proceed criminally.

D/Sgt. Miller stated he did have a relationship with Sgt. Mys in which personal issues were discussed, both on and off duty. He stated he wanted to increase her self-awareness regarding her use of alcohol, indicating that he is a recovered alcoholic who has not had an alcoholic drink in twenty years. Miller stated that he did not commit any of the acts Sgt. Mys alleged to have occurred.

The bulk of the investigation is centered around the events that were alleged to have occurred at Sgt. Mys' home on June 17, 2005. The accounts given by Sgt. Mys and D/Sgt. Miller have some consistencies, such as they both admit that two "french kisses" transpired between them that evening, one before the alleged criminal act and one after the alleged act. Their perspective of events between the kisses differ broadly however.

The investigation established both parties engaged in less than professional verbal exchanges on duty.

| PAGE 1 of 14 | INVESTIGATED BY LT SCOTT MARIER #145 F/LT DANIEL E PEKRUL #41 | REPORTED BY F/LT DANIEL E PEKRUL #41 | REVIEWED BY SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

## TIME/DATE/VENUE:

Incident #1-Unknown date or time (day shift), in fall of 2004, Newaygo Post, 360 Adams St., Brooks Twp., Newaygo County.

Incident #2-Unknown date or time (day shift), spring 2005, Newaygo Post, 360 Adams St., Brooks Twp., Newaygo County.

Incident #3-Between 2:00pm and 5:00pm, on Wednesday June 1, 2005, at 8233 Mundy St., City of Newaygo, Newaygo County.

Incident #4-Between 7:00pm and 8:00pm, Friday, June 17, 2005 at the complainant's residence, 17975 Simmons Ave. NE, Sand Lake, Kent County.

## ADMINISTRATIVE/CRIMINAL STATUS/PROSECUTOR'S DECISION:

| | |
|---|---|
| 06/24/05 | Criminal status at inception for potential CSC charges. |
| 06/28/05 | Administrative status at complainant's request-request granted. |
| 07/11/05 | Criminal status at complainant's request-request granted. |
| 07/19/05 | Complainant requests Administrative status-request denied. |
| 07/20/05 | Administrative Status-A.A.G. John Walter briefed, advises no criminal prosecution will take place and to proceed administratively. |

## COMPLAINANT:

NAM: SERGEANT LINDA MYS
P.O. Box/Building: NEWAYGO POST          RAC:          ETH:
NBR:       DIR:                          SEX:          OPS:
STR: 360 Adams St.                       DOB:          SSN:
SFX:                                     HGT:          SID:
CTY: Newaygo       ST: MI                WGT:          FBI:
TXH:               ZIP:                  HAI:          MNU:
TXW:                                     EYE:          PRN:

## INTERVIEW COMPLAINANT SGT. LINDA MYS:

Sgt. Mys was interviewed initially on 6/28/05 at the Internal Affairs office, from approximately 10:00am to approximately 12:20pm. She was interviewed a second time on 7/11/05. Each time she was advised she was being interviewed strictly as a witness regarding this investigation. Both interviews were audiotape recorded and transcripts are available of the first interview.

**Incident #1**-Sgt. Mys stated she was typing something in LEIN at the Newaygo Post when D/Sgt. Miller approached her from behind and placed one of his hands on her left breast. She stated she scooted her chair away from him, threw up her arms and yelled, "God!" She stated it scared and concerned her, but she had not

| PAGE<br>2 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

been mad and D/Sgt. Miller never saw her get mad. Mys added that D/Sgt. Miller made a comment that not all men like big breasts at the time. She further stated that she is not sure when this incident occurred as far as a date and time, and that there were no witnesses to the incident.

**Incident #2**-Sgt. Mys stated that she was in the Newaygo Post, and was traversing through the PCSO office, en route to the locker room to change her clothing. She stated D/Sgt. Miller called her name, she stopped, turned around, and after he said something else, he reportedly pulled her shirt away from her body and looked down her shirt. Sgt. Mys stated she spun away from him and said, "Jesus Christ, Dick!" She stated she then went into the locker room and changed. Mys stated she was not mad at the time, but was scared, offended, and embarrassed. Mys stated there were no witnesses to this incident and that it occurred sometime in the spring of 2005. She stated she did not say anything to D/Sgt. Miller or to anyone else about this incident.

**Incident #3**-Sgt. Mys stated this incident occurred during the spring shoot in 2005, which records reflect would have occurred the afternoon of 6/1/05. Mys stated she was returning to the picnic table area after shooting the long guns, when D/Sgt. Miller reportedly reached over and "grabbed her butt" as they were walking side by side. She stated they were walking behind Tpr. Gary Wilson at the time and that he may have observed this incident because he turned around to say something around the same time Miller grabbed her. She stated she exclaimed, "God!" and moved away from Miller at the time. She further stated she chuckled out of embarrassment when it happened, but never said anything to Miller or anyone else, stating she chose to "run away" from it.

**Incident #4**-Sgt. Mys stated on Friday June 17, 2005 she was alone at her residence when D/Sgt. Miller arrived unannounced. She stated the day earlier he had invited her to dinner for Friday night, she told him she probably wouldn't make it, and he advised he would be there if she did show up. She stated he arrived with some dessert from the restaurant for her, asked for a cup of coffee, and she invited him inside. She stated they were in her kitchen near the coffee pot and she told him she was down because she was thinking about Kevin (Marshall). Mys stated at that time Miller said, "why don't you just give me a kiss?" She stated she was not mad, sort of laughed and moved away, but that she was "suddenly afraid." She stated she walked near her hallway entrance, stating she turned around and was smiling, but was still scared.

Mys stated Miller approached her and stated, "just give me a kiss, that is all I want, just a kiss." She stated she replied, "I'm not going to kiss you." Miller reportedly stated, "well do me a favor. Walk down the hall before I leave and lift up your shirt so I can see, so I'll know what you look like the next time I have this dream." Mys stated she replied, " It's not going to happen Dick." Mys stated she is nervously laughing at this point, she crosses her arms across her chest, Miller walks up and hugs her, and again asks her for a kiss. Mys stated she then kissed him, adding, "if that is what it took to get this guy out of my house, I kissed him."

Mys stated during the kiss Miller unsnapped her bra, she stepped back and stated, "Jesus Christ!" She stated her arms were still crossed and she ran for the couch a few feet away when Miller grabbed the bottom of her t-shirt. Mys stated he ran right along with her and they end up seated next to each other on the couch. She stated she is repeatedly saying, "no," and he is saying, "let me see."

Mys stated, "it was an outright fight" to keep her shirt down, "using all the strength she had in her arms" and he was trying to raise it, stating that eventually he pulled it up far enough to see her breasts before letting go.

| PAGE<br>3 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |

| Internal Affairs<br>ORIGINAL INCIDENT REPORT | ORIGINAL DATE<br>Fri, Jun 24, 2005<br>TIME RECEIVED<br>1730 | INCIDENT NO.<br>001-0000075-05 (SM)<br>FILE CLASS<br>99009 |
|---|---|---|

She stated she jumped up and told him to get the fuck out of her house, but that she was not mad while she was talking to him, and there was nervous laughter. Mys stated her bra had not come off, but that she was sure he had seen her breasts. She stated Miller laughed and stated, "you're not going to bring sexual harassment charges against me are you?" She replied, "No Dick, I just want you to get the fuck out of my house." Mys stated she thinks Miller knew she was scared and he put his arms around her, stating her arms were crossed again, and he told her if she kissed him he would leave. Mys stated, "I am like, God Dang it, screw it, and I kissed him." Mys stated she wasn't angry, just scared. She stated Miller then grabbed her butt, pulled her toward him, and she could feel he was aroused. She stated she was thinking, "what the hell is going on?"

Mys stated when the kiss was done she advised Miller to leave and he did. She stated she does not recall what conversation there was at that point, stating that the whole incident took between twenty and thirty minutes. She stated after Miller left she was "stunned," but at no time did she indicate she was angry at him.

**Following are other points, outside of the criminal arena, that Sgt. Mys brought forth during the course of her two interviews, stating that:**
- Approximately one year ago D/Sgt. Miller began making inappropriate comments and she began to feel uncomfortable around him.
- Approximately six months ago it became physical, in that Miller would say he would like to kiss her, bump into her at work, and began showing up at her house unannounced.
- She never brought her feelings to his attention or to the Department's attention, stating she ran away from the problem.
- She and Miller are equal rank and he has not used his position over her at all.
- She didn't want anything to happen to Dick Miller. She just wants him to leave her alone.
- She feels partially at fault because she did not address the issue sooner and instead ran from the problem.
- Miller told her he wished he was fifteen years younger, she replied she wished he wasn't married.
- One of the first times he came to her house unannounced her mother showed up, and she's the only witness that he was ever at her house.
- Things started to become physical at work, as he would come up from behind and rub her neck and back, and he would bump into her at the post and make comments such as, "I just can't keep my hands off of you, I am sorry."
- He asked her to rub his neck in his office and she complied, thinking it was a dumb thing for her to do, but he was a friend.
- She made it clear she did not want a relationship with him because he was married.
- They have had dinner together twice off duty and have met for coffee after work a couple of times.
- He advised her while at dinner at the Northern Trails restaurant that his marriage was not going well, she was talking about Tpr. Marshall's death, and they were "leaning on each other's shoulder." He stated he wished he could kiss her during this dinner.
- He stated to her several times at work that he would like to kiss her, then he would apologize later. She stated this usually occurred on weekends when nobody else was in the post, or in his office when Scott (Rios) was not around. She stated she stopped going into his office.
- She told him in the fall of 2004 that if he came over and saw her garage door up he could stop in, otherwise not to. She stated she knew she always closed her door and was a way for her to deal with him coming over without confronting him.

| PAGE<br>4 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

- One Saturday in the post, near the P/C's office, he was telling her how bad things were with his wife, his eyes were tearing up, he's giving her "the puppy look," and he places his thumb on her chin and asks her to kiss him. She told him he was married and that they could not do that.
- In the late summer of 2004 she gave him a hug in the post, truly felt bad for him, and didn't care if anyone had seen them, stating he was crying and needed a hug.
- Over the last six months she has been concerned any time they were in the same room by themselves, and there were times he would reach across her to get something, rub against her breast, and make a comment like, "you know Linda, I am sorry, I just can't keep my hands off you."
- She and Miller are very private and that's why they are each other's confidant, adding she thinks they both have serious issues.
- He told her about this dream he'd had of her in which she is naked, he reaches out to touch her while talking about her breasts, and she floats away. She stated he asked her what that meant and she stated, "I must be teasing you and leading you on and I need to knock it off." She stated he replied, "No, it means that I can look but not touch." She stated Miller is fascinated with breasts.
- She "never fathomed" Miller would come over to her house the night of June 17th (even though he had come to her house before).
- Miller came into the post on Saturday, June 18th, asked her if anyone was there and she lied and told him Tpr. Runions was in the back, when in fact he had just left. She stated he asked her if she was mad at him and she told him she was mad at herself for letting it happen. She stated he told her not to be mad at herself and he departed.
- On Sunday, June 19th, he called her at the post and invited her for ice cream in the Sand Lake area to "sweeten her up." She advised him she did not want him over to her house again and that this time she was mad while speaking with him. She stated he told her, "I don't blame you" and they hung up.
- On Monday, June 20th, he spoke with her at the post, apologized to her, and she ignored him all week. She stated she started to get angry during the week, but she did not tell F/Lt. Leavitt because she did not want an IA and knew he would have no choice (Note: later in the interview I asked her if she would have submitted a UD-93 had this not been referred from Behavioral Science and she stated, "absolutely")
- On Thursday, June 23rd, she spoke with Miller in the post parking lot, at which time he told her he was sorry, he had violated her trust, and wasn't aware of how she was feeling. She stated he told her that her morals are clearly higher than his own and described himself as a weak person. She added he kept asking her to hit him.
- There had been no other contacts with him since June 23rd.

## PRINCIPAL:

NAM: DETECTIVE-SERGEANT RICHARD MILLER
P.O. Box/Building: NEWAYGO POST           RAC:           ETH:
NBR: 360         DIR:                     SEX: M         OPS:
STR: ADAMS                                DOB:           SSN:
SFX: STREET                               HGT:           SID:
CTY: NEWAYGO          ST: MI              WGT:           FBI:
TXH:                  ZIP: 49337          HAI:           MNU:
TXW:                                      EYE:           PRN:

| PAGE<br>5 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

## INTERVIEW PRINCIPAL:

D/Sgt. Miller was interviewed on June 30, 2005 in the Internal Affairs office at headquarters. Present were myself, Miller, and Sgt. Herendeen, MSPTA president. The interview started at 3:12pm and ended at 5:28pm. D/Sgt. Miller was offered a break per contractual obligations and it was declined. Prior to the interview I read D/Sgt. Miller O.O.#1 sections 4.35 and 4.35a, and ordered him to answer my questions truthfully.

The following are D/Sgt. Miller's responses to each of the criminal allegations:

**Incident #1**- Miller was asked if he ever touched Sgt. Mys' breast near the LEIN and commented that not all men like big breasts. He stated that did not occur. He did say there was an instance in which he made a comment about breast size to Sgt. Mys. He stated she had commented to him three or four times that she thought she had small breasts. He said the first time was when she was packing materials for the haz-mat suits and everything had been delivered but the over-boot. He said she was sitting on the floor with her legs crossed, with stuff all around her, and he asked what she was doing. She replied she was doing haz mat stuff and she was missing the booties, followed immediately with the comment, "I wish I had big boobies." Miller stated she went from booties to boobies. He stated he looked at her and asked what she had said, to which she replied, "I think I've said too much already." He then told her there was nothing wrong with how she looked, that she looked wonderful, and she should not be ashamed with how she looked.

He stated there was another occasion in which Sgt. Mys was making derogatory remarks about a female trooper who had breast augmentation. Miller stated the trooper was quite attractive and described Mys as more "wholesome." Miller stated Mys commented, "I was just as big as she was." He stated he did not make a comment following her declaration.

Miller stated the third instance occurred at work when Mys again commented that she wished she had bigger boobs. He told her this was the third time he heard her say that she was, "dissatisfied with the way the Lord built you." He told her there was nothing wrong with the way she was built and that, "a lot of guys like small breasted women, and I'm one of them." She reportedly told him he would not hear about it again from her. He stated she seemed somewhat offended that he criticized her by pointing out this was the third time she had brought this up. He stated she did not appear to be offended by his comment that he liked small breasts himself, and she offered no comments regarding it.

**Incident#2**-D/Sgt. Miller denies ever reaching out and pulling Sgt. Mys' shirt away from her body in order to look down it. He stated he could think of an occasion that may fit that description. He indicated she was in the hallway at the post and was bending over to pick up boxes, when he turned the corner and saw her. He stated he could see that her top was open and commented it was a "pretty view." When she questioned "what view," he said when she was bending over "it kind of hangs out." He stated she then said something like she was glad somebody had noticed. He stated a few minutes later he acknowledged that wasn't an appropriate comment and asked if it had offended her. She reportedly told him to forget about it. Miller stated that is the only incident he recalls that is even remotely connected to this allegation. He stated in this incident she never exclaimed, "Jesus Christ Dick!" or anything like that.

| PAGE<br>6 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs<br><br>**ORIGINAL INCIDENT REPORT** | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

**Incident #3**-D/Sgt. Miller stated he did not reach out and touch Sgt. Mys on the buttocks during the spring shoot. He stated when he read this allegation he was amused and could not imagine under what set of circumstances he would have ever done something so stupid. He stated he has no idea what Mys is referring to and he is totally bewildered by the allegation. He does not recall walking with Mys behind Tpr. Wilson, nor does he recall Sgt. Mys exclaiming "God!" or anything like that for any reason. He stated he has no recollection of any contact with her that she may have mistaken as him reaching out and touching her buttocks.

**Incident #4**-Miller stated he did go to Mys' house the evening of June 17, 2005, guessing between 7:30pm and 8:00pm. Miller stated he was at her house ten to fifteen minutes, maximum. He stated he had invited her out to dinner that evening because although Mys was professing that she was doing well with the alcohol program he had observed fresh bruises on the inside of her arm where he felt she had recently fallen. He also saw other signs she was drinking again. He told her he was treating himself to dinner next Friday and if she wanted to, she was welcome to come along. She initially responded she would like to and asked what time. He told her 6:30-7:00pm. She stated she had something she had to take care of that afternoon and the day of the dinner she told him she might not be able to get there. He commented that she would not be there, alluding to the fact he felt she was drinking again. She responded she might be there, but he knew she would not be there.

He stated she did not show up and after he ate he bought a piece of cheesecake to take to Mys. He stated he arrived at her house, indicating it was four to five miles from the restaurant, and left the car running in the driveway with the door open. He stated he walked up and rang the doorbell and she answered the door after some delay. He told her, "here's your dessert. You're too embarrassed to be seen in public, but there you go." He said, "catch ya later" and turned to walk back to his car at which time she stopped him and invited him in for a cup of coffee. He told her he did not have a lot of time, but had time for one cup of coffee.

After turning off his car he went into Mys' house with her and entered the kitchen. He stated she started making a pot of coffee at which time he looked over and saw a can of beer. She saw him looking at it at which time she put her head against the cabinet and started to cry a little bit. She commented, "That's why I didn't want to go to dinner with you Dick. I did not want you to find out about my drinking again." He stated he put his hand on her left shoulder while she was facing away from him, and told her it was no crime to stumble, but that she had to keep trying. He said when he placed his hand on her shoulder she remained standing against the wall, turned away from him.

He stated she then turned and put the coffee pot down, gave him a big hug. He advised she placed her hand behind his neck and commented that she needed him. She told him he is the only one who accepts her the way she is. He stated she was looking up at him and he was looking down at her when she kissed him and he kissed her back. He stated what he did not expect was a french kiss. He stated she then hung on to him after kissing, putting her head on his shoulder. Miller stated she then commented how long it has been. She commented how good it felt to hug someone who wants you.

Miller stated she then pointed down the hallway toward her bedroom, commenting that she wanted to take him in there and put him in bed and lay him down. He told her that was not a good idea and that it could not happen. He stated he interpreted her comments to mean she wanted to have sexual intercourse. He stated he told her she was flattering him, she was younger than he was, and asked her what she saw in a guy his age. She reportedly told him that he was no older than her ex-husband, that he was in good shape and looked good.

| PAGE<br>7 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

He stated he then began walking through the dining room towards the front door. He stated he then told her he would be scared silly to have sex with her, that he was afraid she would get pregnant. He said her face then brightened up and she said, "I would like that!" He told her he was fifty-seven years old and if they had a child together he would be seventy before the child was a teenager. She then responded that when the kid got out of high school she would be sixty. He stated he then told her again that it could not happen and he could not give her a baby.

Miller stated he then started for the door again when Mys gave him another hug and kiss. Miller advised the second kiss was also a french kiss, initiated by Sgt. Mys. He stated the kisses took place in the kitchen and the dining room. He stated he was never standing near the hallway entrance. He stated he never, at any point on the 17th, asked Mys to walk down the hallway and lift her shirt so he could see her breasts. He denied telling Mys that he would leave her house if she kissed him. He stated she had been drinking and he had not. He stated he may have mentioned a dream he'd had and asked if she remembered it and that it meant he could look, but not touch. He stated he was never on Mys' couch the night of the 17th. He denied the entire incident in which Mys described him holding onto her shirt and him forcing it up once they were on the couch in order to view her breasts. He was hesitant to say she was lying and indicated he thought she may actually be delusional from her drinking. He stated if she said something like that happened then she probably really believes that it did.

Miller stated he never saw Mys' bra or breasts the evening of the 17th. He stated he never raised her shirt up and when asked if she raised her shirt herself he replied, "not that I know of." He stated he did not unsnap her bra while they were hugging and kissing. He advised Mys was angry with him only at the point when he was leaving. He stated she said, "Do you remember what you told me at work the other day? Get the fuck out of my office!" He replied, "okay, see you Monday." He further explained that he had made that comment to her at work, because he was trying to work and she has a habit of coming in with paperwork and, "yapping up a big storm about this and that," so he told her to get the fuck out of his office.

Miller stated after she said that to him he left. He assumed she was upset with him and it's possible she was upset because he turned down the invitation to go into her bedroom with her. He also feels she was truly embarrassed she had fallen of the wagon, she is proud, and does not want people to know she has weaknesses. He stated he felt he was a close friend of hers and he cares for her as a person, stating he sees a lot of good qualities in her. He speculates she was hurt because he thought she wasn't attractive, stating he wished it had never happened. He added that he could not talk to her about her alcoholism at work.

**The following are other points made by D/Sgt. Miller or brought out through direct questioning:**

- He and Sgt. Mys were co-workers initially and then a friendship evolved. He and Mys became confidants regarding personal matters and that this aspect of their relationship would have developed after Tpr. Marshall's death. He and Mys did associate off duty, stating they have had dinner, lunch, or coffee at times.
- He had dinner with her the first time at a restaurant outside Croton in late 2004. He does not specifically recall telling Mys he was fifteen years younger, adding he knows he has said it before. He stated it is possible Mys told him she wished he was not married during the dinner. The content of the discussion during that dinner centered around her divorce and the resentment she had toward her ex-husband. He

| PAGE<br>8 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |

| Internal Affairs<br>**ORIGINAL INCIDENT REPORT** | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

agreed the content of that dinner discussion would have been a mix of work related topics and personal topics.

- He stated he has visited Sgt. Mys at her residence. He believes the first time may have been three years ago after she purchased a new home and Mys' mother was there as well. He stated he was there approximately five minutes. He stated she had invited him to stop by if he was in the area.
- He stated he remembers she told him she would appreciate it if he not stop by if she has company, but does not recall anything regarding the garage door being up or down as a factor whether he can stop by.
- He stated he stopped at Mys' residence around Christmas 2004 to drop off candy to her. He stated he did this because she seemed offended after he had given candy to the post secretary and she asked where hers was. He stated he rang the doorbell, nobody answered, so he simply put the box in the front door and left.
- He recalled the incident in which he placed a honey bee cage (transports queen bee) in Mys' home mailbox, indicating it may very well have been the same visit that he dropped off the box of candy. He stated he put it there because she had expressed an interest in his honey bee hobby. He stated he thinks he was working when he dropped it off and that's why he left it in the mailbox.
- He recalled another instance of being at Mys' home, possibly fall or winter 2004. He stated he called her and told her he was coming over and she said okay. On that date he explained to her that he was an alcoholic, had been one for a number of years, but had not had a drink in twenty years. He stated he did this because he felt Sgt. Mys had a drinking problem herself, that she acknowledged she had a problem, and was scared "management" would find out. On that date she confided to him she had been seeing Dr. Woolford regarding Tpr. Marshall's death. He recalls she asked him if he would be her mentor and he said no. He told her he was not qualified to do that and was just sharing with her his personal experiences regarding alcohol use. He stated Mys asked him how he "kicked it" and he told her, telling her she had to keep searching for whatever will work for her. He stated when he was preparing to depart, Mys gave him a big hug and told him she was very alone. He stated he told her he was seventeen years older than she was and she responded by saying, "so what" and pointed out that was the age difference between her and her ex-husband. He advised her on that visit he could not be her lover, only her friend. He stated he no recollection of any further physical contact during that visit.
- He stated Sgt. Mys did advise him not to visit her at her home, this being on June 18 or June 19, 2005. He stated he telephoned Mys and asked if she would like to meet for ice cream in the Sand Lake area. It was during that conversation he recalls she stated, "I do not want you to take this wrong, but you are not to come over to my house again." He stated prior to this she never advised him to not visit her at her home.
- He stated Mys has several times told him she wants a baby and is looking for a man, telling him she is very angry at her ex-husband for not giving her a child. He stated Mys has asked him to father her child. He stated she asked him this on June 17, 2005. He responded that he could not do that. He stated she had not ask him to father her child prior to that.
- He stated he told her numerous times he was fifty-seven years old, and much too old to think about starting another family. She told him if she got pregnant she would be sixty by the time her child graduated from high school. He told her he hopes she finds somebody.
- He stated Mys has never requested he leave his wife.
- He stated Mys is fixated on Tpr. Marshall's death and manner of death. He stated she has a lot of hostility toward Tpr. Marshall's wife, expressing to him that Mrs. Marshall has never grieved properly over Tpr. Marshall's death.
- Mys confided in him that she had been doing some weekend alcohol treatment programs. He stated he could tell when she was drinking however, saying she would come to work and keep the lights off because

| PAGE<br>9 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs<br>**ORIGINAL INCIDENT REPORT** | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

the light hurt her eyes. He stated he would see the, "usual tired, worn-out look of a drunk." He stated he recognized it as a look he used to have himself.

- He stated he stopped at her house unannounced, approximately 1-2 months after the visit in which he told her he was an alcoholic. He was noticing "horrendous" bruises on her arms at work. He asked if someone was smacking her around and she replied she bruised easy, that she tripped over her cat going down the stairs. He went to her house because another female at the post, who Mys is close to, told him that Mys tripped down the stairs after she had drank too much. He noted it took a long time for her to open the door. She invited him in for coffee. He stated it was obvious once inside the house that she had been drinking very heavily. He stated she was embarrassed that he was seeing all the empty beer containers. She told him she was scared to death she was going to get caught drunk. **NOTE:** At this point D/Sgt. Miller wanted it on record that he had promised Sgt. Mys that he would not discuss her alcohol dependency as well as her suicidal tendencies. He was emotional and on the verge of tears at this point in the interview.
- He continued that he had her trust and had intended to keep it. He stated there were several times that night she told him she was, "so tired, didn't want to fight anymore, and wanted to end it." He said she had divorced herself from her family. Specifically, Mys' sister, a medical doctor, discovered her alcohol abuse after running tests on her. According to Miller, Mys then shut her sister out of her life. He asked if she had spoken to Dr. Woolford about this and she replied she had, but he's not convinced she had due to the way she responded. He told her she had to get her drinking under control, and he made her promise him if she was ever to the point of suicide to call him, or somebody. He stated she would not make that promise.
- He stated Mys is a functional alcoholic who does not drink during the day, but that once she gets off work she, "pounds them down." He stated Mys described to him a time she gave herself a PBT when she woke up, first thing in the morning, and she was over the legal limit. He stated she drinks to avoid the pain of Kevin Marshall and that she has no social life.
- In addition to initiating a hug, he stated Mys has initiated a kiss as well, on June 17th.
- He stated during the dinner in Croton at Northern Trails, a male radio dispatcher observed them at dinner together and that seemed to embarrass her. He told her he and she were co-workers, came in separate vehicles, and there was nothing improper about them having dinner together. He stated after dinner she hugged him in the parking lot, saying he purposefully left his hands in his pockets, as he did not want to be accused of hugging her back.
- He initially advised he and Mys have never kissed or hugged while on duty. He later advised he had hugged her on duty, along with giving her a pat on the shoulder.
- He stated aside from kissing and hugging he and Mys have not engaged in any other from of intimacy.
- He stated he has never had intercourse, oral intercourse, or digital penetration with Sgt. Mys, nor has he placed his hand under her shirt, on back of her shirt, in her pants or on her pants. He stated she has never done any of those things to him either.
- He stated the only time he has initiated a hug with Mys was on June 17th.
- He stated he has never fondled Sgt. Mys' breasts or buttocks.
- He stated, while kissing Sgt. Mys, she never asked him to stop, stating, "no, just to the contrary." He stated she "absolutely" responded to him physically when they kissed.
- He stated aside from her telling him not to come back to her house, Sgt. Mys never told him she did not want to associate with him outside of work related duties.
- He advised aside from the first dinner in Croton, the other two were at his request. He stated he wanted to give Mys something to do away from her house. He was not encouraging her to "date" him. He stated he told her she was a pretty young lady and was trying to give her some confidence. He was trying to

| PAGE<br>10 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |

Case 1:10-cv-00794-RJJ   ECF No. 34-2 filed 05/31/12   PageID.404   Page 16 of 19

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

determine how badly she had slipped back into the alcohol when he asked her to go out to dinner. He advised one time she showed, guessing it may have been spring 2005, and one time she did not, on June 17.

- He stated Mys has come to work battered and bruised to the point "you would think somebody had been beating on her." He stated she had a cut lip she attributed to getting after a quad runner came up off the hitch and struck her. He stated about a month later he asked how she was doing and how her (treatment) program was going. She said it was going okay and started walking away. She then reportedly stopped, turned around with tears in her eyes, and told him she could not lie to him, that she was drinking again. He asked her what had happened to her lip. He said she then told him she had awakened face down in the garage, in her nightgown, and blood had frozen to her face. She told him she woke up in bed later in the morning, her pillow was all bloody, and she could put her finger right through her lip. He told her he had figured something like that had happened and he stressed to her she had to do something, that she was killing herself. She then told him she was going to go into a five day program to dry out, but was afraid to tell the post commander, and she was assigned to a paper squad due to Benton Harbor riots. He advised her she had a medical condition that need to be treated. He told her he had to tell the post commander. He said she went to the program and it seemed to help for three weeks. He then came to to work and the lights were dimmed and she had a bruise. He knew she had resumed drinking.
- He stated the reason he contacted Mys when he did so off duty was because he was, "trying to help a fellow officer become sober."
- He stated there was one occasion in his office in which he was trying to crack his own neck and Sgt. Mys came in. She asked what was wrong and he said his neck hurt. She said, "let me try." He said she rubbed his neck and while doing so put her breasts right up tight to his head, rubbing his head with her breasts. He believes this was an intentional act on her part. He stated he turned, looked at her, and stated, "you can cut that out for a half an hour." She replied, "you flatter me" and he said, "no, you flatter me." He stated he never solicited for a neck rub, she offered and he accepted. He stated there was nobody else in the room at the time.
- He stated he has never intentionally bumped into Sgt. Mys at work.
- He stated he has never reached across her and intentionally rubbed against her breasts or any other body part. He stated something like that could occur accidentally at the post while reaching for files, etc.
- He does not recall any specific incidents in which he may have bumped her or rubbed against her accidentally and she may have interpreted it as intentional.
- He stated Mys has never bumped or rubbed against him to his recollection.
- Miller stated Mys would come into work at times and tell him she'd had another dream about him. He would ask her if it left a smile on her face and she'd reply, "it sure did." The second time she told him she'd dreamed of him, he asked her if he was still a good guy, and she replied he was, that they had full body contact, and "she left him sore." He then told her he'd dreamed about her and she asked what it was. He stated he told her she was floating nude in a swimming pool, she was smiling, and each time he got closer she floated away. He stated she then asked him if he thought she was a tease and he told her the dream was reminding him that he could look but not touch.
- Miller initially stated he never brought this dream up the evening of June 17th. Later, he stated it was possible he mentioned the dream in their conversation the night of the 17th.
- Mys told him to never stop over if she had company and he never violated that request.
- He stated he has no recollection of ever expressing an interest to kiss Sgt. Mys while on duty, nor has she ever expressed anything like that to him that he is aware of.

| PAGE<br>11 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

- He denied ever making a comment that he could hardly keep his hands off her. He stated he has no recollection of making any comments similar to that either.
- He stated Mys had never directed him not to have contact with him until June 19th.
- Miller does not recall asking Sgt. Mys if she was going to bring sexual harassment charges against him or anything to that effect.
- He stated he does not recall seeing Mys at the post on Saturday June 18th, only remembers calling her on the telephone that day. He stated it's not uncommon for him to go to the post on weekends, he only lives five miles away.
- He does not recall asking Mys whether she was mad at him on Saturday, June 18th. He stated the first question he asked when he called was if there was an ice cream shop in Sand Lake. She told him she did not want him to misunderstand, but he was not to go back to her house again. He told her he understood, thinking she was referring to a time in which she'd had an affair with a guy, and he thought she was thinking she and he were heading down that road.
- Miller does recall apologizing to Sgt. Mys on Monday, June 20th. He stated it was obvious she was upset over "whatever." He told her apparently he had done something to upset her and whatever it was, he was sorry. He stated he was trying to keep the door of communication open with her.
- He stated what really hurts is he had to break his promise to her in order to defend himself in this mess. He stated he grossly underestimated her degree of emotional problems.
- He stated on Thursday, June 23rd he did speak to Mys in the post parking lot. He told her that if she thought he somehow had violated her trust then he apologized. He also told her he was concerned about her and that she scared him, referring to her depression. He told her if she cannot call him then to please call somebody. She would not promise and told him she would get over it. He does recall Mys telling him that day that she was terrified of him and he asked her, "what the hell for?" He stated he had no clue where that was coming from and asked her if she thought he would actually come to her house and do something to her. He added that's where he remembers thinking something in her thinking had snapped. He stated he knew at that point there was some type of psychotic episode she had gone into and he had no clue what was going on. He stated he never asked her to hit him. He stated he did say if it would make her feel better to hit him then go ahead, and she just smiled and said that wouldn't do any good. He said she then walked away.
- When asked who he thought should be interviewed at the post he said, "everybody." He pointed out that if all these types of things had been going on, someone would have seen it, and there's strict policy prohibiting it.
- When given the opportunity at the end of the interview to add anything, D/Sgt. Miller stated he did not do this. He stated what hurts is that Linda believes it, she's basically a good person, and when she's sober she's a pleasure to have around. He strongly suggests someone do something to address her alcohol problem, and that her current stage she is far worse than he ever was. He stated it's his understanding that she drinks seventeen to twenty-one beers a night. He stated she starts at 5pm, and that's too much booze. He stated he was just trying to help a drunk understand what it's like to be a drunk.

**WITNESS:**

NAM: TROOPER GARY WILSON
P.O. Box/Building: NEWAYGO POST          RAC:              ETH:
NBR: 360       DIR:                      SEX:              OPS:
STR: ADAMS                               DOB:              SSN:

| PAGE<br>12 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

| SFX: STREET | | HGT: | SID: |
|---|---|---|---|
| CTY: NEWAYGO | ST: MI | WGT: | FBI: |
| TXH: | ZIP: 49337 | HAI: | MNU: |
| TXW: | | EYE: | PRN: |

### INTERVIEW WITNESS:

Tpr. Wilson was interviewed on 06/29/05 at Sixth District Headquarters. Prior to the interview he was advised he was being interviewed strictly as a witness. The interview was audiotape recorded.

Tpr. Wilson confirmed he was the Newaygo Post range officer and that he coordinated and facilitated the spring firearms refresher for the post personnel. He was questioned as to whether he heard or saw any unusual exchanges, either verbal or physical, between Sergeants Mys and Miller. He stated he did not hear or see anything out of the ordinary. When specifically asked whether he saw D/Sgt. Miller touch Sgt. Mys on the buttocks he stated he did not. When asked whether he saw any movement that may have suggested it may have happened he stated he did not. When asked whether he heard Sgt. Mys exclaim in any manner during the spring shoot he stated he did not.

At the conclusion of the interview, Tpr. Wilson was ordered to not speak of this investigation to other departmental members unless directed to do so by a supervisor.

### CONTACT BEHAVIORAL SCIENCE SECTION:

On 8/12/05 I made contact with Dr. Woolford. He confirmed he reported this situation to the Department and had to have his client's permission to do so. He stated he would need Sgt. Mys to sign a release in order to discuss anything further. It should be noted that Sgt. Mys had informed me earlier in the investigation, without being prompted to do so, that she was going to contact Dr. Woolford and sign a release.

I contacted Sgt. Mys on 8/12/05, who stated she had not signed a release to date, but would do so as long as my query only pertained to what she told Dr. Woolford regarding D/Sgt. Miller. I explicitly advised her it was totally up to her whether she wanted to sign a release. Sgt. Mys called me later in the afternoon of 8/12/05 and advised the release had been signed.

I recontacted Dr. Woolford who confirmed he had obtained a limited release allowing him to speak only about the events between Sgts. Mys and Miller. He stated he was participating in the interview at the patient's request and that a signed release had been received. Dr. Woolford stated that he and Sgt. Mys began a scheduled session on 6/24/05. He stated he immediately noticed she was different that day, appearing apprehensive and nervous.

He stated he inquired as to what was wrong and she indicated she had been attacked by another member. Note: Dr. Woolford stressed he was not drawing from notes, just his memory, and the words he was using were his own, not Sgt. Mys'. Dr. Woolford recalled she told him D/Sgt. Miller had been making it clear he wanted a relationship with her. She advised he had asked her to dinner, she said no way, he said he'd be there and she said she would not. She indicated he showed up at her house and she let him in, which she told Dr. Woolford was her big mistake. She indicated she and Miller discussed their having a relationship, he moved

| PAGE<br>13 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|

| Internal Affairs | ORIGINAL DATE<br>Fri, Jun 24, 2005 | INCIDENT NO.<br>001-0000075-05 (SM) |
|---|---|---|
| ORIGINAL INCIDENT<br>REPORT | TIME RECEIVED<br>1730 | FILE CLASS<br>99009 |

to kiss her, and she moved away, with both of them ending up on the couch. Dr. Woolford indicated Mys related to him that Miller was trying to lift up her shirt and thinks she said he eventually got his "peek." He remembers her saying she got up from the couch and ordered Miller out, and that she said Miller would not leave until he got a kiss. He stated he and Mys discussed the kiss in what he thinks would have been the next session. He stated although he does not remember the specific language she used to describe the kiss, he was left with the impression it was not a tongue kiss, or a passionate kiss, but rather more of an obligatory kiss.

Dr. Woolford was asked if he saw any signs of deception or anything that made bells go off when Sgt. Mys was describing the events of June 17th. He stated there were no signs of deception and in fact there were definite physiological responses (IE Sgt. Mys was physically shaking) that confirmed to him that something had happened. He added that Sgt. Mys was extremely embarrassed and ashamed to tell him what happened, and by the time she was interviewed by IA she may have broken out of her "victim role."

Dr. Woolford stated he had advised Sgt. Mys the best course of action was to inform someone (within the department), she agreed, and it was agreed to inform F/Lt. Leavitt. Dr. Woolford had nothing further to add.

## CRIME VICTIM'S RIGHTS:

I advised Sgt. Mys that due to her not wishing this to be reviewed criminally, I was not going to provide her with a UD-30 and she agreed.

## EXTERNAL DOCUMENTS:

- TD-7 for D/Sgt. Miller
- TD-7 for Sgt. Mys
- Transcript of Sgt. Mys' first interview
- Audiotapes (3) of both the first and the second interview of Sgt. Mys
- Audiotapes (2) of D/Sgt. Miller's administrative interview
- Audiotape (1) of Tpr. Wilson's interview

## STATUS:

Open, pending District review/input and IA closing.

| PAGE<br>14 of 14 | INVESTIGATED BY<br>LT SCOTT MARIER #145<br>F/LT DANIEL E PEKRUL #41 | REPORTED BY<br>F/LT DANIEL E PEKRUL #41 | REVIEWED BY<br>SM 8-12-05 |
|---|---|---|---|